**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **BILL IBRAHIM,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **Civil No. 1:07-CV-02295 RMC** |
| **v.** | : | |
| | : | **Judge Rosemary M. Collyer** |
| **UNISYS CORPORATION,** | : | |
| | : | |
| **Defendant.** | : | |

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

Plaintiff Bill Ibrahim, through counsel, respectively submits this memorandum of points and authorities in opposition to the Motion to Dismiss filed by Defendant Unisys Corporation ("Unisys"). Unisys's motion should be denied for the reasons stated below.

**STATEMENT OF FACTS**

Plaintiff Bill Ibrahim ("Ibrahim") is a former employee of Defendant Unisys Corporation ("Unisys"). Complaint ¶¶ 1-2. Mr. Ibrahim, a Muslim, is originally from Somalia and became a citizen of this country in 1996. Complaint ¶ 6. On or about June 9, 2006, Ibrahim filed a complaint with the EEOC alleging unlawful discrimination by the defendant. Complaint ¶ 4. On or about September 25, 2007, Ibrahim received a right to sue letter since more than one hundred and eighty days had passed since the filing of the complaint.[1] Complaint ¶ 5.

Mr. Ibrahim first became employed with Unisys in September 2002 in the position of team leader in the corporate information systems department. Complaint ¶ 6.

---

[1] Footnote their misleading statement here, & expand later.

Mr. Ibrahim performed his duties at a high level of achievement during his tenure at Unisys and received many statements from his clients praising his work, including but not limited to the following.   Complaint ¶ 13.   On November 14, 2002, the TSA sent an email commending Ibrahim's work.   Id.   On March 7, 2003, Perot Systems sent an email commending Ibrahim's work.   Id.   On March 18, 2004, the Navy Federal Credit Union commended Ibrahim's work.   Id.   On November 12, 2004, the John Alwine of the SDC office of Unisys emailed Ibrahim to tell him he had done a "good job" on his work that week.   Id.   On January 14, 2005, Arthur W. Fox, a VP at Change Architect, Inc., sent an email full of high praise for Ibrahim's work.   Id.   On March 1, March 24, and April 13, 2005, Fannie Mae commended Ibrahim's work.   Id.

At times relevant to this litigation, Mr. Paul Testa ("Testa") was a manager at Unisys and Mr. Ibrahim's direct supervisor while Ibrahim was employed with the company.   Complaint ¶ 8.   Mr. Ibrahim has worked in the computer field since 1986 and is certified in various programs, including but not limited to MCSE, MCSA, Rt and network plus.   Complaint ¶ 9.   While employed with Unisys, Mr. Ibrahim was dispatched to service various clients of Unisys throughout the metropolitan area.   Id.

Mr. Ibrahim was subjected to a hostile work environment at Unisys created and sustained by Mr. Testa.   Complaint ¶ 10.   In July of 2003, Mr. Testa informed Mr. Ibrahim that Ibrahim was not going anywhere in the company.   Id.   There was no basis for such an assertion by Mr. Testa other than his dislike for Mr. Ibrahim.   Id.   In 2004, Mr. Ibrahim was demoted from his position as team leader without explanation or justification.   Complaint ¶ 12.

Mr. Ibrahim was never promoted during the entire time that he was employed by

2

Unisys even though he was the most qualified applicant for many positions and applied for many positions, including but not limited to the following.   Complaint ¶ 14.   In November of 2004, Mr. Testa recommended that Mr. Ibrahim be terminated from employment and again asserted that he was not going anywhere in the company. Complaint ¶ 15.

Mr. Testa had disdain for Mr. Ibrahim because Ibrahim was originally from Somalia, is a Muslim, and possesses dark skin.   Complaint ¶ 16.   In December of 2003, Mr. Testa referred to the incident in Somalia in the early 1990's involving U.S. servicemen and further stated in Ibrahim's presence that all Somalis should be hung. Complaint ¶ 11.

Mr. Testa continued to maintain a hostile work environment for Mr. Ibrahim throughout Ibrahim's employment with Unisys by routinely doing the following: rejecting time sheets submitted by Mr. Ibrahim without justification; rejecting training vouchers submitted by Mr. Ibrahim and denying him the opportunity to receive training which would allow him to advance in his profession; rejecting expense vouchers submitted by Mr. Ibrahim again without justification, which meant that Mr. Ibrahim was never reimbursed for many of the expenses he incurred while traveling as part of his work for Unisys; denying requests for vacation made by Mr. Ibrahim again without justification; refusing to sign security clearance sheets submitted by Mr. Ibrahim again in doing so denied Ibrahim the opportunity to advance in the company.   Complaint ¶ 17.

Moreover, Mr. Testa routinely called Mr. Ibrahim names in the workplace such as "nigger" and "boy."   Complaint ¶ 17.f.   Mr. Testa further stated that if Mr. Ibrahim contacted the Human Resources Department nothing would happen and at one point

3

stated that if HR was called I will hang you.   Id.   No other similarly situated employees of Unisys were treated in such a way as Mr. Ibrahim.   Id.

Mr. Ibrahim's work environment became so hostile and intolerable that he contacted Unisys's Human Resources Department in late 2004 and informed it of the manner in which Mr. Testa was treating him.   Complaint ¶ 18.   Mr. Ibrahim continued to communicate with Unisys's Human Resources Department at its corporate headquarters in Norcross, Georgia throughout 2005 concerning the hostile work environment he was being subjected to, however, no corrective action was either recommended or taken by Unisys.   Id.   Ultimately realizing that Unisys did not intend to deal with the situation and the unlawful conduct continuing unabated, Mr. Ibrahim resigned his position from the company on or about October 21, 2005.   Id.

**STANDARD OF REVIEW**

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) challenges the legal sufficiency of a complaint on its face, testing whether a plaintiff has properly stated a claim for relief.   The court must treat the complaint's factual allegations, including mixed questions of law and fact, as true, drawing all reasonable inferences in the plaintiff's favor.   *Macharia v. United States*, 334 F.3d 61, 64, 67 (D.C. Cir. 2003); *Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156, 165 (D.C. Cir. 2003).   Any doubts concerning the sufficiency of the claim must be resolved in favor of the nonmoving party.   *Sinclair v. Kleindienst*, 711 F.2d 291, 293 (D.C. Cir. 1983).

At this pleading stage, a complaint may be dismissed only upon a determination that the plaintiff cannot establish "any set of facts consistent with the allegations in the complaint" to support the alleged claim. *Bell Atlantic Corp. v. Twombly*, ___U.S.___,

4

127 S. Ct. 1955, 1969 (2007) (citations omitted); *Harris v. Ladner,* 127 F.3d 1121, 1123

(D.C. Cir. 1997); *Kowal v. MCI Communications Corp.,* 16 F.3d 1271, 1276 (D.C. Cir.

1994).   A motion to dismiss is viewed with disfavor and should not be granted unless it

appears beyond a doubt that the plaintiff can provide no set of facts in support of his

claim which would entitle him to relief.   *Doe v. U.S. Dep't of Justice*, 753 F.2d 1092,

1102 (D.C. Cir. 1985).

## ARGUMENT

**I.     PLAINTIFF'S COUNT I ALLEGES HOSTILE WORK ENVIRONMENT AND HARASSMENT CLAIMS WITH MORE THAN SUFFICIENT DETAIL TO WITHSTAND UNISYS'S MOTION TO DISMISS.**

**A.     Harassment and hostile work environment here are shown here by Mr. Testa's repeatedly and routinely calling Mr. Ibrahim "nigger" and "boy" as well as other misconduct, none of which was stopped by Unisys even though it knew of the misconduct for over one year.**

Plaintiff Ibrahim has alleged his hostile work environment and harassment claims

with more than sufficient detail to withstand Unisys's motion to dismiss.   Mr. Ibrahim

has alleged that his supervisor at Unisys, Mr. Paul Testa, "routinely" called him a

"nigger" and "boy" while he was on the job.   Complaint ¶ 17.   Mr. Ibrahim has further

alleged that he complained to Unysis's Human Resources Department in Norcross,

Georgia, from June of 2004 until he left Unisys on October 21, 2007, regarding Mr.

Testa's slurs and other improper treatment; but Unisys took no action.   Complaint ¶ 18.

Unisys does not dispute these allegations.

Being routinely called a "nigger" while on the job is per se discriminatory and by

itself creates a prima facie case of hostile work environment and harassment.[2]   Courts

---

[2]   In racial, ethnic, and religious harassment cases, certain epithets and symbols have been singled out by the courts as so demeaning that they either constitute "per se"

5

throughout the nation have recognized that an employer is liable for a hostile work environment and harassment when it permits its employees to use the term "nigger" and similar racial epithets.[3]

"The use of the word 'nigger' automatically separates the person addressed from every non-black person; this is discrimination per se." *Bailey v. Binyon*, 583 F. Supp. 923, 927 (N.D. Ill. 1984). *See also Sims v. Montgomery County Commission*, 766 F. Supp. 1052, 1097 (M.D. Ala. 1990) ("The term 'nigger' is so severely dehumanizing that its use in the workplace on just a few occasions can render the workplace psychologically intolerable. Moreover, the detrimental effect of the term is multiple when an employer who has knowledge of the use of the term takes no action or takes only weak action, because the employer through its lack of an adequate response has implicitly condoned and encouraged the use of the term and thereby rendered a further blow to the humanity

---

harassment or only one or two incidents can be sufficient for hostile work environment liability. Donna M. Ryu, *Establishing A Hostile Work Environment Based on A Protected Status Other than Sex* (ABA/BNA 2001). Epithets are regarded as especially egregious and capable of engendering a severe impact. Id. Prof. Ryu refers one to the discussions and citations in *Taylor v. Metzger*, 152 N.J. 490, 502-3 (1998) (single incident involving phrase "jungle bunny"); Robert J. Gregory, *You Can Call Me a "Bitch" Just Don't Use the "N-word": Some Thoughts on Galloway v. General Motors Service Parts Operations and Rodgers v. Western Southern Life Insurance Co.*, 46 DePaul L. Rev. 741, 748 (1997) ("Courts have viewed racist epithets as beyond the pale, regardless of the prevalence of these epithets in the workplace"); Mari J. Matsuda, *Public Response to Racist Speech: Considering the Victim's Story*, 87 Mich. L. Rev. 2320, 2338 (1989) ("However irrational racist speech may be, it hits right at the emotional place where we feel the most pain"); Charles R. Lawrence III, *If He Hollers Let Him Go: Regulating Racist Speech on Campus*, 1990 Duke L.J. 431, 452 (1990) ("The experience of being called 'nigger,' 'spic,' 'Jap,' or 'kike' is like receiving a slap in the face. The injury is instantaneous"). Plaintiff relies on Prof. Ryu's work in much the following pages.

[3]    "An employer is directly liable for a hostile work environment created by any employee if the employer's negligence causes the actionable work environment. An employer is negligent with respect to [racial] harassment if it knew or should have known about the conduct and failed to stop it." *Baty v. Willamette Indus., Inc.*, 172 F.3d 1232, 1241-42 (10th Cir. 1999) (quotation omitted), *overruled on other grounds by Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002).

of its black employees"); *Delph v. Dr. Pepper Bottling Co.*, 130 F.3d 349, 356 (8th Cir.

1997) (use of "nigger" "cannot be characterized as harmless or casual," and "even in jest

could be evidence of racial antipathy"); *Daniels v. Essex Group, Inc.*, 937 F.2d 1266-67,

1273-74 (7th Cir. 1991); *E.E.O.C.    v. Beverage Canners Inc.*, 897 F.2d 1067, 1068 n. 3

(11th Cir. 1990)(hostile work environment proved by testimony that plant manager and

supervisor called black employees "niggers," "ignorant nigger," and "Swahilis;" manager

also said that "blacks were meant to be slaves" and proclaimed that "[t]hose niggers out

there will not get anywhere in this company"); *Snell v. Suffolk County*, 782 F.2d

1094,1098 (2nd Cir. 1986) (even though "scurrilous postings and racial epithets occurred

only sporadically," employer liable for hostile work environment; deputies referred to

other deputies as "nigger," "coon," "black bitch," and "spic," and posted

"advertisements" for the "Niggers Back to Africa Movement"); *Taylor v Jones*, 653 F.2d

1193, 1198-99 (8th Cir. 1981)(racially discriminatory work atmosphere found where

co-workers called black workers "niggers," "spooks," "uppity nigger," "smart nigger,"

and "boy"); *Harris v. International Paper, Co.*, 765 F. Supp. 1509, 1517-19 (D. Me.

1991) (hostile environment racial harassment found where supervisor called black

workers black nigger," "goddamn nigger," "black ass," "watermelon man," and

"Buckwheat," and said that they "would never advance" and withheld training from

them), *vacated in part*, 765 F. Supp 1529; *Demby v. Preston Trucking Co.*, 961 F. Supp

873, 877 (D. Md. 1997) (perhaps the ugliest and most distressing incident of racial

bigotry and hatred involved a phrase painted on the wall behind plaintiff's desk saying

"woch [sic] your back nigger," along with a swastika painted on his desk.) *See also Josey*

*v. John R. Hollingsworth Corp.*, 996 F.2d 632, 641 (3rd Cir. 1993) (evidence that

7

anonymous note writers had referred to plaintiff as a "nigger" was properly considered as circumstantial evidence of the atmosphere in which the company made its employment decisions. "One could infer from the employees' remarks and the racially derogatory notes [plaintiff] received that the management permitted an atmosphere of racial prejudice to infect the workplace."); *Walker v. Ford Motor Co.*, 684 F.2d 1355, 1358-59 (11th Cir. 1982) (poorly repaired cars were called "nigger rigged"); *Mozee v. American Commercial Marine Service Co.*, 940 F.2d 1036, 1044 (7th Cir. 1991) (sign stating "No Nigger Riggers" posted in rigging unit where no African-American employees worked); *Moore v. KUKA Welding Sys. N Robot Corp.*, 171 F.3d 1073, 1077 (6th Cir. 1999) ("nigger-rigging" used to refer to poor workmanship, "jokes" using word "nigger," sign reading "kill all niggers").

Nothing in the motion that Unisys filed counters the above analysis.   In fact, Unisys fails to mention the word "nigger" in its filing and fails to address the fact that its supervisor Mr. Testa routinely called Plaintiff Ibrahim "nigger" and "boy" during Ibrahim's entire tenure at Unisys, even though Ibrahim had repeatedly sought intervention by notifying the human resources department and headquarters at Unisys.

Routinely calling a person a "nigger" on the job is simply wrong and, moreover, actionable under Title VII in that it is per se evidence of a hostile work environment and harassment and establishes a prima facie case under Title VII.   Racially charged name-calling, such as "Buckwheat" and "Toby," was evidence of a hostile work environment and harassment in *Daniels*, 937 F.2d at 1274 (plaintiff "was the victim of racial taunts such as the nickname 'Buckwheat'"); *Harris v. International Paper Co.*, 765 F. Supp at 1518-19 (racist graffiti in restrooms included "Buckwheat"); and *Chauffeurs v.*

8

*Iowa Civil Rights Commission*, 394 N.W.2d 375, 379 (Iowa 1986) (plaintiff called "Toby", recognized by the court as a slave in the movie "Roots").   *See also Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 438 (2nd Cir. 1998) (use of racial slurs can create an objectively hostile or abusive workplace in violation of Title VII; plaintiff called "spic" on three occasions by his direct supervisor); *Torres v. Pisano*, 116 F.3d 625, 632-33 (2nd Cir. 1997) (a reasonable Puerto Rican would find a workplace in which her boss repeatedly called her a "dumb spic" and told her that she should stay home, go on welfare, and collect food stamps like the rest of the "spics" to be a hostile workplace); *Amirmokri v Baltimore Gas & Electric Co.*, 60 F.3d 1126, 1131 (4th Cir. 1995) (reasonable person could easily find the workplace environment hostile to Iranian worker who was called "camel jockey," "the local terrorist," "the ayatollah," and "the Emir or Waldorf, Maryland"); *Boutros v. Canton Regional Transit Auth.*, 997 F.2d 198, 200-01 (6th Cir. 1993) (Syrian worker called "camel jockey," "camel rider," "Heeb," "rug peddler," "You are a rich Arab.   Why don't you go back to Syria and kill the Jews?"); *Erebia v. Chrysler Plastic Products Corp.*, 772 F.2d 1250, 1252 (6th Cir. 1985) (Mexican employee called "wet back" and "tomato picker," and taunted with "go back to Mexico, there is some white person that could be doing" his job); *Weiss v. United States*, 595 F. Supp. 1050, 1053 (E.D. Va. 1984) (supervisor and co-worker's comments included "resident Jew," "Jew faggot," "rich Jew," "Christ killer," "nail him to the cross," and "you killed Christ, Wally, so you'll have to hang from the cross"); *Compston v. Borden, Inc.*, 424 F. Supp. 157, 158 (S.D. Ohio 1976) (plaintiff's supervisor called him "kike," "the Jew-boy," "the Christ-killer," "the damn Jew," and "the goddamn Jew") (plaintiff successfully established claim for harassment based on religion and national origin

9

(Jewish faith and ancestry) even though he had never been a practicing Jew); *Smallzman v. Sea Breeze, Inc.,* 1993 WL 15904 (D. Md. Civ. A. No. HAR 92-2702, Jan. 7, 1993) (owner and manager called worker, to his face, a "useless fucking Jewboy," said in his presence that one "can't trust Jews around anything" and "the guy is probably Jewish; that's why the situation is all screwed up," and told their two-year-old grandson/son "that's what a Jew-boy looks like.   See that.   You don't want to be a Jew-boy" in front of the worker).

Plaintiff Ibrahim's national origin claim is also sufficiently alleged in order to establish a prima facie case of hostile work environment and harassment.   Mr. Ibrahim's supervisor Mr. Testa repeatedly made comments regarding Ibrahim's Somilia origins, including saying that "all Somalis should be hung," in addition to calling him "nigger" and "boy."   Complaint ¶ 11, 16, 17.   A reasonable person in Mr. Ibrahim's situation would find such comments offensive and would see the workplace as discriminatorily hostile.  *See Torres v. Pisano*, 116 F.3d 625, 632-33 (2nd Cir. 1997) (reasonable Puerto Rican would find a workplace in which her boss repeatedly called her a "dumb spic" and told her that she should stay home, go on welfare, and collect food stamps like the rest of the "spics" to be hostile); *Boutros*, 997 F.2d 198 (6th Cir. 1993) (Syrian worker called "camel jockey," "camel rider," "Heeb," "rug peddler," "You are a rich Arab.   Why don't you go back to Syria and kill the Jews?"); *Erebia*, 772 F.2d at 1252 (Mexican employee called "wet back" and "tomato picker," and taunted with "go back to Mexico, there is some white person that could be doing" his job); *Amirmokri*, 60 F.3d at 1131 (Iranian worker called "camel jockey," "local terrorist," "ayatollah," and "the Emir of Waldorf, Maryland"); *Livingston*, 141 F.3d 434 (plaintiff called "spic" on three occasions).

10

**B.     The harassment and hostile work environment here was "severe and pervasive."**

Harassment and hostile work environment cases also require that the misconduct complained of be "severe and pervasive."   Plaintiff Ibrahim, as outlined above, has sufficiently alleged incidents of harassment and hostile work environment to show that the misconduct he encountered at Unisys was "severe and pervasive."   Plaintiff has alleged that the misconduct here—including the racial epithets as well as denials of promotions, training, security clearances, times and expense sheets—continued for almost one year after he complained to Unisys's corporate human resources department in Norcross, Georgia, yet Unisys did nothing.   In fact, the harassment in question continued right up until the point when the plaintiff resigned from employment from the company.   By that point, the incessant hostile work environment had become intolerable. Clearly, the harassment and hostile work environment here was severe and pervasive.

There is no "threshold magic number" that courts will apply to determine whether the conduct meets the "severe or pervasive" standard.   *Rodgers v. Western-Southern Life Ins. Co.*, 12 F.3d 668, 674 (7th Cir. 1993): *Vance v. Southern Bell Tel. & Tel. Co.*, 863 F.2d 1503, 1511 (11th Cir. 1989).   Employers cannot "disaggregate" the various allegedly discriminatory acts and endeavor to cast doubt on each one.   *Durham Life Insurance v. Evans*, 166 F.3d 139, 149 (3rd Cir. 1999) (lower court had appropriately refused to consider each discriminatory incident in a vacuum).

Courts have applied several general principles in determining the "severe or pervasive" standard.   First, courts consider the number of incidents as a factor, but this is not alone determinative.   *Woods v. Graphic Communications, Union Local 747*, 925 F.2d 1195, 1201 (9th Cir. 1991); *Daniels*, 937 F.2d at 1273-74; *Smith v. Northwest*

11

*Financial Acceptance, Inc.*, 129 F.3d 1408, 1415 (10th Cir. 1997) (finding six statements during approximately two years of employment sufficient for a hostile work environment; "[T]he word 'pervasive' is not a counting measure. The trier of fact utilizes a broader contextual analysis. It begins with the number, sequence, and timing of the conduct. The fact finder then looks at the nuances of an environment that is imposed by each instance of discriminatory behavior."); *Livingston*, 141 F.3d at 438 (three incidents of ethnic slurs in one year constitutes colorable claim of harassment).

Second, the required showing of severity or seriousness of the harassing conduct varies inversely with the pervasiveness or frequency of the conduct. In other words, the more egregious the conduct, the fewer incidents needed to meet the legal standard. *Ellison v. Brady*, 924 F.2d 872, 878 (9th Cir. 1991); *Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1463 n.4 (9th Cir. 1994). Thus, the more serious the incidents the less frequently they need occur to establish a hostile work environment.

Courts have recognized that under the "severe-or-pervasive" test, a single incident of invidious harassment can create a hostile work environment. *See, e.g., Daniels*, 937 F.2d at 1274 n. 4 (indicating a single instance of racial harassment can establish a hostile work environment); *Torres*, 116 F.3d at 631 n. 4 (single incident of sexual harassment can in some circumstances suffice to state a claim of hostile work environment sexual harassment); *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1305 (2nd Cir. 1995); *Taylor*, 152 N.J. 490 (single incident involving racial epithet "jungle bunny" may be sufficient to establish a hostile work environment). The EEOC also recognized that a single incident, if sufficiently severe, can create a hostile environment. *Schott v Runyon*, No. 4-G-1381-92, 1996 WL 350896 at *6 (E.E.O.C. June 20, 1996) (citing EEOC Policy

12

Guidance on Current Issues of Sexual Harassment, Notice N-915-050, at 104 (March 19, 1990)).

Courts do not use a hard and fast rule regarding the specific time period within which harassing conduct occurs in order to be sufficiently severe or pervasive. *See*, *e.g.*, *Waltman v. International Paper Co.*, 875 F.2d 468, 476 (5th Cir. 1989) (hostile work environment claims not defeated by time gaps between the specific incidents of harassment, noting cases in which harassment involved separate incidents spanning many years); *Ways v. City of Lincoln*, 871 F.2d 750, 755 (8th Cir. 1989) (evidence of an average of three incidents per year over seventeen-year employment sufficient for hostile work environment claim.)

*Brown Transport Corp. v. Commonwealth*, 578 A.2d 555, 558 (Pa. Commw. Ct. 1990)[4] ruled that it was religious harassment for an employer to put religious articles in its employee newsletter and Christian-themed verses on its biweekly paychecks. *Dernovich v. City of Great Falls*, Mont. Hum. Rts. Comm'n No. 9401006004 (Nov. 28, 1995) was based on sexually themed jokes that were distributed about every two weeks. *Schwapp*[5] involved an average of one offensive statement every two

---

[4]    A separate holding of *Brown Transport* -- relating to the Pennsylvania Human Relations Commission's power to award punitive damages -- was overruled by *Hoy v. Angelone,* 720 A.2d 745 (Pa. 1998), but *Brown Transport*'s substantive holding that the employer's speech created a hostile environment was not affected by *Hoy*.

[5]    *Schwapp v. Town of Avon,* a Second Circuit case holding that "ten racially-hostile incidents of which [plaintiff] allegedly was aware during his 20-month tenure," of which only four occurred in his presence, were enough to create a potential

months; if one counts only statements heard personally by the plaintiff, the rate was one every five months. *Schwapp*, 118 F.3d at 111-12. *Danco, Inc. v. Wal-Mart Stores, Inc.*, 178 F.3d 8, 16-17 (1st Cir. 1999) affirmed a harassment and hostile work environment under 42 U.S.C. § 1981 finding based on "three race-related incidents":  two personal slurs (one including a threat), plus the words "White Supremacy" spray-painted in a parking lot.

The severity of the harassment should be judged from "the perspective of a reasonable person in plaintiff's position, considering 'all the circumstances.'" *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81, (1998) (quoting *Harris*, 510 U.S. at 23).  Far more than a "mere offensive utterance," the word "nigger" is pure anathema to African-Americans. "Perhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as 'nigger' by a supervisor in the presence of his subordinates." *Rodgers v. Western-Southern Life Ins. Co.*, 12 F.3d 668, 675 (7th Cir. 1993) (citation and internal quotation marks omitted); *White v. BFI Waste Servs., LLC*,

---

harassment case.  "The district court," the Second Circuit held, "erred in failing to consider the eight . . . incidents that did not occur in [the plaintiff] Schwapp's presence," including one "made prior to Schwapp's employment" and "two comments made during Schwapp's employment [but outside his presence] that were hostile toward minority groups of which Schwapp is not a member . . ..  [T]he fact that a plaintiff learns second-hand of a racially derogatory comment or joke by a fellow employee or supervisor also can impact the work environment . . ." *Schwapp v. Town of Avon*, 118 F.3d 106, 111-12 (2nd Cir. 1997).

14

375 F.3d 288, 298 (4th Cir. 2004).   Some words are so offensive that, when uttered

repeatedly, they can foster "an abusive working environment" even if they are not

accompanied by threat of physical injury.   *Spriggs v. Diamond Auto Glass*, 242 F.3d

179, 185 (4th Cir. 2001).

*Spriggs* is quite similar to the instant case.   In the instant case, Plaintiff Ibrahim's

supervisor Mr. Testa "routinely" called Ibrahim "nigger" and "boy".   Complaint ¶17(f).

In *Spriggs*, the plaintiff's supervisor "habitually" called Spriggs a "monkey," "dumb

monkey," and "nigger."   242 F.3d at 182.   Mr. Spriggs's wife did not even escape his

supervisor's crude racism, as the supervisor "repeatedly referred to her as a 'black bitch'

in Spriggs's presence."   Id.

Plaintiff Ibrahim also has alleged sufficient facts to support an action for

harassment and hostile work environment here.   While Unisys contends Ibrahim's

complaint fails to state a claim, its analysis of this issue is not just misleading, it is

wrong.

Unisys claims the facts here do not support a cause of action for harassment or

hostile work environment, yet somehow Unisys makes its argument without once

acknowledging that its supervisor Mr. Testa routinely called Mr. Ibrahim a "nigger" and

"boy."   Unisys also manages to ignore the fact that Mr. Ibrahim complained to its HR

department and corporate headquarters for over one year, yet Unisys did nothing to deter

Mr. Testa from routinely calling Mr. Ibrahim a "nigger" and "boy."

Unisys similarly tried to distort the "logical inference" to be drawn from the facts

alleged in ¶ 17.   First, Unisys claims that ¶ 18 limits the timeframe of the ¶ 17's

incidents to late 2004, even though ¶ 18 states:

15

> Mr. Ibrahim continued to communicate with HR at their offices in
> Norcross, Georgia throughout 2005 concerning the hostile work
> environment he was being subjected to, however, no corrective action was
> either recommended or taken by Unisys.   Ultimately realizing that Unisys
> did not intend to deal with the situation and the unlawful conduct
> continuing unabated, Mr. Ibrahim resigned his position from the company
> on or about October 21, 2005.

Therefore, a fair reading of the complaint and ¶¶ 17 and 18 leads to a "logical inference"

that Mr. Ibrahim was subjected to a hostile work environment—including being called

"nigger" and "boy"—throughout his entire tenure at Unisys, even though he complained

to Unisys's HR department and its corporate headquarters, ending only with his

resignation on October 21, 2005.

Mr. Ibrahim was subjected to a hostile environment at Unisys from the first day

he encountered Mr. Testa to his last day of work, October 21, 2005.   Mr. Ibrahim filed

his EEOC charge on June 9, 2006, which permits this Court to consider events that

transpired back to mid-August 2005.   The hostile environment—being routinely called

"nigger" and "boy," being denied training, denied promotion, denied security clearances,

denied reimbursement for expenses, denied pay for hours worked, denied any hope for

advancement, etc.—began in 2002, continued throughout Mr. Ibrahim's entire tenure at

Unisys, and ended only with his resignation on October 21, 2005.   Therefore, Mr.

Ibrahim has clearly alleged facts sufficient to show that the hostile work environment and

harassment continued on a "routine" basis from 2002 through October 21, 2005.

Unisys's cases on this point provide no support for its preposterous contentions.

First, *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998) provides no help for Unisys.

The facts underlying the *Faragher* employees' claim of hostile work environment are

nothing like the facts alleged here.   Most notably, in *Faragher* there was no allegation

16

that the employee had been "routinely" called "nigger and boy" by his supervisor.   524 U.S. 780-81 (wherein the Court discusses the hostile work environment facts).[6]   In the instant case, Mr. Ibrahim has alleged that his supervisor Mr. Testa "routinely" called him "nigger" and "boy".   Complaint ¶ 17.   Therefore, as shown above, Mr. Ibrahim has clearly alleged a viable cause of action for hostile work environment and harassment.

Unisys's second case—*Rattigan v. Gonzales*, 503 F. Supp. 2d 56 (D.D.C. 2007)—likewise provides no support for its argument.   The facts underlying the hostile work environment claim in *Rattigan* do not include allegations that the employee had been "routinely" called "nigger" and "boy" by his supervisor.   503 F. Supp. 2d at 79-83 (wherein the court discusses the hostile work environment facts).

In the present case, it is apparent from the face of the complaint that Plaintiff Ibrahim has sufficiently alleged a hostile work environment claim based on incidents comprising "one unlawful employment practice" of intimidation (here, being threatened with hanging), insult ("routinely" being called "nigger" and "boy"), and ridicule (same).

Important here is the fact that the racial insults—being called "nigger" and "boy"—were directed at Mr. Ibrahim by his supervisor Mr. Testa.   Therefore, the present case is unlike *Rattigan* because in *Rattigan* the single comment about the plaintiff's "Arab brothers" was made "outside of plaintiff's presence."   503 F. Supp. 2d at 79.   As seen above, the present case is much more similar to the dozens and dozens of cases in which a hostile work environment and harassment were proved by the repeated use of racial epithets such as "nigger" and "boy" in the workplace.

---

[6]   Also, the employer in *Faragher* took action against its wrong-acting employees, while here Unisys did nothing, despite Mr. Ibrahim's repeated complaints.   524 U.S. 782-83.

Plaintiff Ibrahim has clearly established that he was subjected to a hostilei a hostile work environment..   Cases from the District of Columbia provide further support for plaintiff's position..   In *Reid v. O'Leary*, No. C.A. 96-401, 1996 WL 411494 (D.D.C. July 15, 1996) the court found a hostile work environment had been created by the use of a single epithet:   plaintiff had been presented with a "Coon Ass Certificate" signed by a co-worker.   To state a claim for hostile work environment under Title VII:

> All that needs to be established is that the alleged conduct be unreasonably abusive or offensive in the workplace environment or adversely affected the reasonable employee's ability to function in his or her job.

*Reid v. O'Leary* at *3, quoting *Turner v. Barr*, 806 F. Supp. 1025, 1027 (D.D.C. 1992). *Turner v. Barr*, 811 F. Supp. 1, 3-4  (D.D.C. 1993) found a hostile work environment where a Jewish U.S. deputy marshal was exposed to a "joke" about the Holocaust told by his supervisor, in addition to discriminatory overtime assignments and other harassment ("Jews were supposedly skilled in dealing with money" etc.; in fact, the entire office appears to have been permeated with racism).   *Villenes v. United Brotherhood of Carpenters and Joiners of America, AFL-CIO*, 999 F. Supp. 97, 100  (D.D.C. 1998) found a prima facie case of a hostile work environment had been established where a black employee's white supervisor utilized discriminatory discipline and made disparaging racial remarks about the plaintiff.

Plaintiff Ibrahim's "ability to function in his job" was clearly affected by Mr. Testa's "routinely" calling him a "nigger" and "boy."   As one commentator put it:

> This makes sense as a matter of substantive harassment law:  For instance, if I (a Jew) know my coworker is a virulent anti-Semite, I might find it hard to work around him even if he's always polite to my face.  Having to work around people who hate you (even politely hate you) might well create a "hostile, abusive, or offensive work environment."  But this

18

> shows that harassment law provides no safe harbor even when one is talking to coworkers who one knows won't be offended -- any bigoted statements made at work may lead to harassment liability.

Eugene Volokh, *What Speech Does "Hostile Work Environment" Harassment Law Restrict?,* 85 Geo. L.J. 627 (1997).

There can be no doubt than Mr. Testa's "nigger" and "boy" comments—which he "routinely" made to Plaintiff Ibrahim during the entire course of Ibrahim's employment with Unisys—and which never was stopped by Unisys despite Ibrahim's repeated pleas for intercession—created a hostile work environment.   Mr. Testa's conduct was unreasonably abusive or offensive in the workplace environment, and Unisys is liable for its failure to take action upon learning of Mr. Testa's conduct.

Courts have also approved large verdicts in recent hostile work environment and harassment cases with facts similar to those present here, i.e., cases in which racial slurs and epithets were used routinely.   In *Moore v. KUKA Welding*, 171 F.3d at 1077, the Sixth Circuit confirmed the trial court's judgment affirming a jury awarding $70,000 in compensatory damages and $70,000 in punitive damages to plaintiff-worker for a hostile work environment and constructive discharge by defendant companies, due to isolation and racial slurs ("nigger-rigging" used to refer to poor workmanship, "jokes" using word "nigger," sign reading "kill all niggers").

In *Robinson v. City and County of Denver*, 30 P.3d 677, 680-82 (Colo. App. 2000) ruled that evidence of threats and epithets ("nigger," "nigger lover," etc.) supported a finding of a racially hostile work environment and a jury award of $165,000 in damages as well as $207, 525.86 in attorney fees and costs.   In *Ross v. Douglas Co.*, 234 F.3d 391, 393 (8th Cir. 2000) the Eighth Circuit upheld a $100,000 hostile work environment

19

verdict for a black correctional officer who was repeatedly called a "nigger" and "black boy" by his black supervisor.

Another recent case in this arena was *Jordan v. City of Cleveland*, 464 F.3d 584 (6th Cir. 2006), where the Sixth Circuit affirmed a jury award of $175,000 in compensatory damages for a black firefighter who was subjected to a hostile work environment and racial and retaliatory harassment. The plaintiff had been assigned to a firehouse that had a "Wall of Hate" with derogatory comments directed at black firefighters (e.g., "Monkey Island,") and plaintiff was called "Sambo" and "Welfare Fighter." 464 F.3d at 597. *See also Danco,* 178 F.3d at 10 (First Circuit affirmed a judge-reduced award of $300,000; jury had awarded $650,000 for harassment and hostile work environment).

**C.  Plaintiff's failure to promote claim should be allowed to go forward**

Plaintiff's promotion claim should also be permitted to proceed. As noted in *Sparrow v. United Air Lines, Inc*., 216 F.3d 1111, 1115 (D.C. Cir. 2000), in a racial employment discrimination case a plaintiff may survive a motion to dismiss by simply stating that 'I was turned down for a job because of my race."

Cases most similar to this case include *Beverage Canners*, 897 F.2d at 1068 n. 3 (hostile work environment proved by testimony that plant manager and supervisor called black employees "niggers," "ignorant nigger," and "Swahilis;" manager also said that "blacks were meant to be slaves" and proclaimed that "[t]hose niggers out there will not get anywhere in this company"). Recall that in the present case Mr. Testa "routinely" called Plaintiff "nigger" and "boy" and told him he would "never go anywhere" in Unisys. Complaint ¶¶ 17, 10. Another similar case is *Harris*, 765 F. Supp. at 1517-19

20

(hostile environment racial harassment found where supervisor called black workers black nigger," "goddamn nigger," "black ass," "watermelon man," and "Buckwheat," and said that they "would never advance" and withheld training from them).   Again, in the present case, Mr. Testa "routinely" called Plaintiff "nigger" and "boy," told Plaintiff he would never advance at Unisys, and withheld training and security clearances from Plaintiff.   Complaint ¶ 17, 10.

Unisys attempts to make much of the fact that the two promotion listed by Plaintiff by way of example in the complaint may have been filled before the 300-day period here preceding Plaintiff's EEOC complaint.   While there are no facts to show that the June 2005 promotion was filled before mid-August 2005, which alone defeats Unisys's argument here, Unisys also ignores that Plaintiff alleged that his claim "include[ed] but [was] not limited to" the two promotions specified.   Complaint ¶ 14. Plaintiff further alleged that he was the "most qualified applicant for many positions and applied for many positions" at Unisys, but was not selected due to his race. Id.    All Plaintiff had to allege was "I was turned down for a job because of my race." *Sparrow*, 216 F.3d at 1115.   This he has done.   Accordingly, the promotion claim should proceed.

Plaintiff's other complaints also show a hostile work environment, created and maintained by Mr. Testa without any intervention from Unisys.   This discriminatory misconduct also ran the beginning of Ibrahim's employment with Unisys through the day he resigned, October 21, 2005, continuing for over one year after Ibrahim complained of Testa's conduct to Unisys HR and headquarters.   Complaint ¶ 18.

And these complaints were not "paperwork" errors as Unisys argues in its instant motion:

21

Rejecting time sheets without justification meant that Mr. Ibrahim was never paid for many days he worked for Unisys.   Complaint ¶ 17.a.   Not being paid for work is hardly a "mere paperwork" error.

Rejecting training vouchers and denying Plaintiff the opportunity to receive training meant that Mr. Ibrahim was unable to advance in his profession.   Complaint ¶ 17.b.   And is there any profession in which it is more critical to maintain and improve one's training than the IT profession in which Mr. Ibrahim works?   Clearly, rejecting training vouchers and denying training is a fundamental adverse employment action, and certainly not a "mere paperwork" error as Unisys urges.

Rejecting expense vouchers without justification meant that Mr. Ibrahim was never reimbursed for many of the expenses he incurred while traveling on the job for Unisys; traveling from one client to another in the greater Washington area was an integral, daily part of Plaintiff's work for Unisys.   Complaint ¶ 17.c.   Not being paid for expenses is hardly a "mere paperwork" error.

Refusing to sign—for no good reason—security clearance sheets submitted by Mr. Ibrahim, which again in doing so denied Ibrahim the opportunity to advance in the company, meant that Ibrahim was not permitted to work on a large majority of Unisys's clients, even though Ibrahim was clearly not a security risk because he had worked at and been praised by the TSA.   Complaint ¶¶ 13, 17.e.   Clearly, refusing to sign security clearance sheets, thereby preventing Mr. Ibrahim from working for a majority of Unisys's clients, constituted a fundamental adverse employment action, and certainly was not a "mere paperwork" error as Unisys argues.

Therefore, there are ample allegations here that a hostile work environment was

22

created and maintained by Mr. Testa, with no intervention by Unisys even after it was aware of the problems for over a year.   These allegations include not only being called "nigger" and "boy" "routinely," the allegations also include not being paid for work or expenses, not being allowed training, not being allowed to work for a majority of Unisys's clients.   Clearly, Mr. Ibrahim has alleged fundamental adverse employment actions that resulted from Mr. Testa's misconduct and from Unisys's failure to stop Testa's misconduct, in addition to being called "nigger" and "boy" "routinely."

Evidence of a hostile work environment need not be as overtly prejudiced as the forms of harassment described above, but can also stem from terms and conditions that fall unfairly and repeatedly on the shoulder of protected class members.   A hostile work environment claim can be established by evidence of more subtle treatment like unfair job assignments, denial of training, and unfair disciplinary action. *Aman v. Cort Furniture Rental Corp*., 85 F.3d 1074, 1081-83 (3rd Cir. 1996); *Allen v. Michigan Dept. of Corrections*, 165 F.3d 405, 410-11 (6th Cir 1999) (evidence of racial harassment included unwarranted disciplinary action and closer monitoring than non-black employees); *Durham Life Insurance Co. v. Evans*, 166 F.3d 139, 148 (3rd Cir. 1999) (sexually hostile work environment encompassed "facially neutral mistreatment plus the overt sex discrimination, both sexual and non-sexual."); *Taylor v. Union Carbide*, 93 F.R.D. 1, 5-6 (S.D.W. Va., 1980) (class certification granted based upon harassment allegations including discriminatory job assignments and disciplinary practices, as well as overt racial conduct such as slurs); *Sims v. City of Montgomery*, 766 F. Supp. at 1094 (discriminatory job assignments); *Daniels v. Essex*, 937 F.2d at 1275 (discriminatory job denial concerning a black employee other than the plaintiff); *Vance v. Southern Bell*, 863

23

F.2d 1503, 1507, 1511 (11th Cir. 1989) (discriminatory discipline); *Winbush v. Iowa by Glenwood State Hospital*, 66 F.3d 1471, 1480 (8th Cir. 1995) (supervisors overlooked rule violations by European-Americans but disciplined similar transgressions by African-American employees; African-American employees were disproportionately assigned more menial and demanding tasks); *Davis v. Kansas City Housing Authority*, 822 F. Supp. 609, 616 (W.D. Mo. 1993)(discriminatory denial of support staff and proper training).

Cases from this court also support Plaintiff Ibrahim here.  *Villines*, 999 F. Supp. at 104, ruled that the harassment need not be racial in content to create a racially hostile work environment; it can be established by evidence that had the plaintiff been white he would not have been treated in the same manner.  *Turner* held that the discriminatory imposition of discipline was sufficient to show harassment and a hostile work environment: "harassment need not take the form of incidents with clearly racial or religious overtones; 'any harassment or other unequal treatment of an employee' caused by the race or religion of the employee may create a violation of Title VII."  811 F. Supp. at 1, quoting (in part) *McKinney v. Dole*, 765 F.2d 1129, 1138 (D.C. Cir. 1985).

In this case we have Plaintiff's supervisor "routinely" calling him "nigger" and "boy".  Plaintiff's supervisor also unfairly denied promotions, training, security clearances, expenses, and even unfairly denied pay to Plaintiff.  Plaintiff Ibrahim has clearly provided sufficient facts to support his claim for harassment and hostile work environment.  Accordingly, Unisys's motion should be denied.

**II.    Unisys's Motion to Dismiss Plaintiff's Count II alleging District of Columbia Human Rights Act violations should be denied.**

Unisys spends much of its brief arguing that Plaintiff's claim under the District of

24

Columbia Human Rights Act (DCHRA) should be dismissed because the EEOC decision here was a final decision on the merits or, alternatively, that filing a DCHRA claim does not toll the statute of limitations.

As acknowledged by Unisys, the EEOC decision here stated that "based on its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes."   Unisys Memorandum at p. 11.   How anyone can read "unable to conclude" to mean "final decision" is mysterious.   The DCOHR's wording in *Brown v. Capitol Hill Club*, 425 A.2d 1309, 1312 (1981), the only case cited by Unisys for this proposition, was entirely different.   In *Brown*, the wording was: "investigation of the complaint was completed."   Here, the EEOC was "unable to conclude" anything "based on its investigation"—clearly, it does not say that its investigation was complete or that it made a final decision.

The EEOC decision here was that it was "unable to conclude."   This Court should read the words just as written—nothing was determined in the EEOC investigation.

As for the statute of limitations argument, the same tolling principles that apply to Title VII claims should apply to DCHRA claims.   Therefore, Unisys's argument here should be denied.

### III.    Unisys's Motion to Dismiss Plaintiff's Count III alleging retaliation for engaging in protected activity should be denied.

As alleged in his complaint, Mr. Ibrahim correctly complained about Mr. Testa's unlawful conduct, filed a complaint with Unisys, and sought corrective action from Unisys.   Complaint ¶¶ 18, 24.   Mr. Ibrahim also alleged that "Unisys retaliated against Mr. Ibrahim for engaging in protected activity and allowed the unlawful conduct to

25

continue unabated."   Complaint ¶ 24.

In this case, as in *Jordan*, 464 F.3d at 598, Plaintiff's claim for retaliation rests primarily on his hostile work environment and harassment claims.   As in *Jordan*, Plaintiff has alleged that the hostile work environment and harassment continued unabated even after he complained to the proper authorities; the racial epithets continued and the improper denials of time sheets, expense vouchers, training requests, and security clearances continued throughout 2005, even to Plaintiff's last day with Unisys. Complaint ¶ 18.   Therefore, unlawful retaliation was properly alleged. .

Plaintiff has alleged that even after he complained to Unisys's HR department and even to its headquarters, Mr. Testa's mistreatment continued unabated throughout 2005, and that Unisys retaliated against him after he complained.   Complaint ¶¶ 18, 24.   Such allegations are sufficient to withstand a motion to dismiss, and, accordingly, Unisys's motion to dismiss Plaintiff's claim for retaliation should be denied.

## CONCLUSION

For the aforementioned reasons, Unisys's Motion to Dismiss should be denied and the matter allowed to proceed forward on the merits.

Respectfully submitted,


/s/ John E. Carpenter_____
John E. Carpenter   #420756
910 17th Street NW   Suite 800
Washington, D.C.   20006
202-887-5445

Attorney for Plaintiff

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that the foregoing opposition to the defendant's motion to dismiss was hereby transmitted via electronic mail on this 16th day of March 2008 to:

Frank C. Morris, Jr. Esq.
Brian Steinbach, Esq.
EPSTEIN BECKER & GREEN, P.C.
1227 25th Street, NW
Suite 700
Washington, D.C . 20037-1156

Attorneys for the Defendant

Alan Kintisch, Esq.
Unisys Corporation
Unisys Way
Blue Bell, Pa.   19424

Attorney for the Defendant

/s/ John E. Carpenter

27